1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

MAYITO GUZMAN,

Case No. 19-cv-03757-HSG

8

Plaintiff,

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT; ORDERING PLAINTIFF TO SHOW CAUSE**

9

v.

10

D. DORSEY, et al.,

11

Defendants.

Re: Dkt. No. 33

12

13

**INTRODUCTION**

14

Plaintiff filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against San

15

Quentin State Prison ("SQSP") correctional officers Dorsey and Boerum regarding events at

16

SQSP, where he was previously housed.  Now pending before the Court is Defendants' motion for

17

summary judgment.  Dkt. No. 33.  Plaintiff has not filed an opposition, despite receiving an

18

extension of time to do so, and the deadline to file the opposition has since passed.  For the

19

reasons set forth below, Defendants' summary judgment motion is GRANTED IN PART AND

20

DENIED IN PART and Plaintiff is ordered to show cause why his case should not be dismissed

21

for failure to prosecute.

22

**DISCUSSION**

23

**I.      Factual Background**

24

The following facts are undisputed unless otherwise noted.

25

In or about November 2011, during reception center processing, CDCR officials identified

26

Plaintiff as related to Norteño gang activity.  Dkt. No. 33-4 at 7.  Plaintiff admitted gang activity

27

but stated that he was an associate, not an active member.  Dkt. No. 33-4 at 7.

28

From April 26, 2017 to March 31, 2018, Plaintiff was housed at SQSP in Level II housing.

1   Dkt No. 33-3 ("Boerum Decl."), ¶ 3 and Exs. 1, 2.  During that time period, defendant Dorsey was

2   a correctional lieutenant and served as an institutional gang investor for the Investigative Services

3   Unit ("ISU"), Dkt. No. 33-4 ("Dorsey Decl."), ¶ 1; and defendant Boerum was a facility captain

4   for Facility A-North and Facility B and responsible for the classification of the inmates in his

5   facility, Boerum Decl., ¶¶ 1, 5.

6        Prior to 2018, inmates were housed either on a general population yard ("GP") yard,

7   intended for inmates who did not require protective custody, or on a Sensitive Needs Yard

8   ("SNY"), intended for inmates who were concerned for their safety due to their status as a sex

9   offender, gang dropout, or informant.  Prison officials would also identify inmates who are

10  members of known prison gangs by labelling them as part of, or affiliated with, a security threat

11  group ("STG").  15 Cal. Code § 3000.  STG inmates are housed on GP yards.

12       In 2017, the California Department of Corrections and Rehabilitation ("CDCR")

13  announced that it would create Non-Designated Programming Facilities ("NDPFs"), where

14  inmates would be housed together regardless of their SNY or GP custody designation, so that

15  inmates would have greater access to self-help, educational, vocational, and rehabilitative

16  programs.  *See* "Non-Designated Programming Facility Frequently Asked Questions (FAQ)",

17  available at https://www.cdcr.ca.gov/blog/non-designated-programming-facility-frequently-asked-

18  questions-faq/ (last visited May 5, 2022); *see also* Dorsey Decl., ¶ 3; Boerum Decl., ¶ 4.  In late

19  2017, SQSP began the process of converting SQSP to a NDPF by integrating SNY inmates with

20  GP inmates.  Dorsey Decl., ¶ 3; Boerum Decl., ¶ 4.  Plaintiff alleges that the NDPF policy

21  implemented at SQSP was part of an effort to remove all Northern California Hispanic inmates,

22  including Plaintiff, from SQSP.

23       Since filing the complaint, Plaintiff has been released on parole.  Dkt. Nos. 34, 35.

24       **A.      Prison Policy Regarding Housing Placement**

25       Inmate housing placements are determined by a classification committee.  Boerum Decl., ¶

26  9.  In determining housing placement, the classification committee considers an inmate's

27  placement score; custody designation; program, work and privilege group; facility placement; and

28  any recommendation for transfer.  Boerum Decl., ¶ 9; 15 Cal. Code Regs. § 3376(d)(3).  The

United States District Court
Northern District of California

2

United States District Court
Northern District of California

classification committee also reviews the inmate's case factors within the prison setting to confirm the accuracy of these scores, designations, and placements. The classification committee meets with the inmate and considers (1) all available information concerning the inmate, including prior disciplinary action, incidents of in-cell violence, placement scores, and security level; and (2) the inmate's views on his program, housing status, and any other matters affecting the inmate within the prison system. Boerum Decl., ¶ 9. Based on this information, the classification committee determines the appropriate housing status for the inmate and whether the committee recommends transfer to a different institution. Boerum Decl., ¶ 9. While classification committees review the inmate's case factors and make a determination regarding transfer or housing status, inmate transfers require endorsement by, and are subject to, approval by a classification staff representative ("CSR"). Boerum Decl., ¶ 10; *see* 15 Cal. Code Regs. § 3379(a)(1). A CSR is a departmental employee designated to represent the CDCR Director in the classification process during the review, approval, or deferral of actions by classification committees. Boerum Decl., ¶ 10. When an inmate is transferred to a new institution, prison staff at the receiving institution hold another classification committee to determine housing placement and programming based on the procedures outlined above. Boerum Decl., ¶ 11.

**B.      January – March 2018**

Prior to January 5, 2018, Facility B Dorms 2 through 5 housed GP inmates and Facility B Dorm 1 housed SNY inmates who were also enrolled in the Enhanced Outpatient Level of Care in the Mental Health Services Delivery System. Boerum Decl., ¶ 5.

On January 5, 2018, new inmates designated as having sensitive needs arrived at SQSP. Boerum Decl., ¶ 6. During the first meal that day, an STG inmate assaulted an SNY inmate. Boerum Decl., ¶ 6. In the following days, prison staff discovered weapons, notes, and written plans between STG-affiliated inmates housed in Dorms 2 through 5 that detailed plans to assault SNY inmates in Dorm 1. Boerum Decl., ¶ 6. There were also reports of threats and attacks on Dorm 1 inmates, including an attempted murder of an SNY inmate by an STG inmate. Boerum Decl., ¶ 6. In response to the attacks on Dorm 1 inmates and the discovery of weapons in Dorms 2 through 5, SQSP placed all Facility B inmates on a modified program from January 18 to March

12, 2018.  Boerum Decl., ¶ 7.   During the time the modified program was in place, the SQSP ISU conducted an investigation to determine which STG inmates were involved in the attacks on Dorm 1 inmates.  Boerum Decl., ¶ 7.  Once these STG inmates were identified, they were transferred to CSP-Solano to ensure the safety and security of the SQSP inmate population.  Boerum Decl., ¶ 8. The transferred inmates were from different STGs and ethnic backgrounds and included both white and Hispanic inmates.

Defendants allege that the transfers were a response to the conflict between STG GP inmates and SNY inmates in January 2018, were intended to ensure the safety and security of the SQSP inmate population, were not based on any consideration of race or ethnicity, and were based on the transferred inmates' affiliations with STGs and their CDCR placement scores.  Boerum Decl., ¶ 9.  Plaintiff argues that these transfers were intended to remove all Northern California Hispanic inmates, including Plaintiff, from SQSP.

### C.     February 8, 2018 Chrono and February 9, 2018 Classification Committee Hearing

On November 29, 2017, Plaintiff appeared before the classification committee for his yearly program/placement review.  Dkt. No. 21 at 7.  At this review, Plaintiff's work performance and overall rehabilitative efforts were reviewed.  The committee elected to retain Plaintiff in SQSP H-Unit Housing due to his case factors and because he had remained discipline free and had received a work override on October 31, 2017.  Dkt. No. 21 at 7.

On February 6, 2018, a correctional counselor requested a classification hearing for Plaintiff.  Dkt. No. 33-3 at 10.  On February 8, 2018, defendant Dorsey issued the following chrono:

> On **February 8, 2018**, you, Inmate **Guzman AI2346** were identified through Strategic Offenders Management System (SOMS) and Electronic Management Systems (ERMS) file reviews, staff interactions, and observations, that you are disrupting Non-Designated Programming Facility housing at San Quentin State Prison.  Specifically, you are in a position of authority/influence in the inmate population to give orders for inmates in Non-Designated Program Facility, currently Facility B, H Unit Dorm 1, to be assaulted/battered. Though you will not be receiving a Rules Violation Report, your presence in SQSP's Mainline population is no longer appropriate.

Dkt. No. 33-4 at 5 (emphasis in original).  On February 9, 2018, a classification committee hearing

4

1   was held, chaired by defendant Boerum, and the committee decided that Plaintiff should be

2   transferred to CSP – Solano.  Dkt. No. 33-3 at 10-13; Boerum Decl., ¶ 13.  Defendant Dorsey had

3   no involvement in the committee hearing.  Dorsey Decl., ¶ 10.

4          Plaintiff makes the following allegations about the February 8, 2018 chrono and

5   subsequent classification committee hearing.  Defendant Dorsey authored the CDCR Form 128-B

6   chrono as part of the plan to remove all Northern California Hispanic inmates, including Plaintiff,

7   from SQSP.  The allegation that Plaintiff is in a position of authority to order the assault of other

8   inmates is false.  Despite this chrono being clearly false and procedurally inadequate, defendant

9   Boerum relied on this chrono to approve Plaintiff's transfer away from SQSP to a higher-level

10  prison where Plaintiff was unable to earn the same amount of good-time credits that he could earn

11  at SQSP.  ECF Nos. 12, 13.  When Plaintiff informed defendant Boerum that he had been recently

12  approved to be retained in H-Unit, defendant Boerum responded, "I see what you mean but the

13  decision has been made above me to get all of you out of here."  Dkt. No. 21 at 8.  When Plaintiff

14  protested that something was obviously wrong "in that a chrono that was made up literally 24

15  hours earlier, with no supporting evidence, and no opportunity to challenge was now being used to

16  disrupt and deprive [him] of the opportunities that Plaintiff had earned and secured at SQSP,"

17  defendant Boerum responded, "It does not matter, you have been identified as the chrono says so

18  what ever you had going here is over.  You can appeal it if you want but this is going to happen,

19  all you can do now is pick your next best option because you are not staying here."  Dkt. No. 21 at

20  8.

21         Defendants describe the February 8, 2018 chrono and subsequent classification committee

22  hearing as follows.  The February 8, 2018 chrono was based on, and issued because of, the ISU

23  investigation initiated by the modified program instituted on January 18, 2018.  In making the

24  transfer decision, the committee did not rely on the chrono.  The chrono did not add points to

25  Plaintiff's classification score.  Dkt. No. 33-2 at 10.  The classification committee reported that it

26  had noted the February 8, 2018 chrono but that the transfer was based on departmental need and

27  "increase in level."  The classification committee concluded that Plaintiff should be transferred out

28  of SQSP due to "Departmental Programming Needs."  The classification committee classified the

United States District Court
Northern District of California

transfer as a "non-adverse Involuntary Transfer."  Dkt. No. 33-3 at 11.  Dkt. No. 33-3 at 11-12.

Plaintiff informed the classification committee that he disagreed with being referred to as an influential "Norteño."  Dkt. No. 33-3 at 12.  At the time, Plaintiff's classification score was a Level III.  Dkt. No. 33-3 at 11.  Plaintiff requested a "hardship" transfer to Deuel Vocational Institute because his father has travel limitations.  In the alternative, he requested a transfer to CSP – Solano, because he sought to enroll in a college program and Patten College had informed him that CSP-Solano was about to begin a college program.  Dkt. No. 33-3 at 11-12.  The classification committee endorsed Plaintiff for a transfer to CSP-Solano, Level III, with Pleasant Valley State Prison, Level III, as an alternate.  Plaintiff's work and privilege groups remained the same.  Dkt. No. 33-3 at 11.

Per prison regulations, the committee action was referred to classification staff representative S. Lacy for auditor endorsement and approval.  Dkt. No. 33-3 at 12-13; *see* 15 Cal. Code Regs. § 3379(a)(1).  On February 13, 2018, CSR Lacy endorsed the committee action to transfer Plaintiff to CSP-Solano, stating that while Lacy had noted the February 8, 2018 chrono, the decision to transfer was "based on Departmental need and increase in level."  Dkt. No. 33-3 at 12.

On or about February 14, 2018, the 128-B chrono was removed from Plaintiff's central file.  Dkt. No. 33-6 at 12.  Defendants contend that the chrono was removed from Plaintiff's central file because of the chrono's perceived negative impact and because the chrono had no impact on the transfer decision.  Dorsey Decl., ¶ 9.

**D.    CDCR Administrative Grievance Process**

During the relevant time period, the CDCR provided inmates with the administrative grievance process set forth in the version of 15 Cal. Code §§ 3084-3086 in effect at that time.[1]

___

[1] The regulations that set out the features of the administrative remedies process for California prisoners underwent a substantial restructuring in 2020.  On March 25, 2020, and effective June 1, 2020, 15 Cal. Code Regs. §§ 3084–3084.9 were repealed and replaced with renumbered and amended provisions at sections 3480 through 3487.  Because the relevant events took place in 2018-2019, the current administrative grievance process does not apply to Plaintiff's claim.  All the citations in this order to the California regulations are to the regulations in place during the relevant period of this action, rather than to the current regulations.

The CDCR provided its inmates "an administrative mechanism for review of departmental policies, decisions, actions, conditions, or omissions that have a material adverse effect upon the welfare of inmates . . ." 15 Cal. Code Regs. § 3084.1(a) (2018). The grievance process required a prisoner to use a CDCR Form 602 "to describe the specific issue under appeal and the relief requested" by stating all facts known and available regarding the issue, and by listing all staff member(s) involved and describing their involvement in the issue. 15 Cal. Code Regs. § 3084.2(a) (2018). A grievance was reviewed at three different levels: (1) a first formal level filed with one of the institution's appeal coordinators, (2) a second formal level filed with the institution head or designee, and (3) a third formal level filed with the CDCR director or designee. 15 Cal. Code Regs. § 3084.7 (2018). Pursuing a grievance through the third and final level satisfied the exhaustion requirement set forth in 42 U.S.C. § 1997e(a). 15 Cal. Code Regs. § 3084.1(b) (2018).

### E.       Grievance No. SQ-18-00591

Plaintiff identified Grievance No. SQ-18-00591 as the grievance raising the claims in this action.[2] Grievance No. SQ-18-00591, submitted on February 18, 2018, was titled "Ilegitamate (sic) Committee Action Disrupting Positive Programming." Grievance No. SQ-18-00591 made the following allegations. On February 9, 2018, the classification committee relied on the unsupported February 8, 2018 128-B chrono authored by defendant Dorsey to unjustly transfer Plaintiff out of SQSP. As a result of this false chrono, Plaintiff has been removed from his work assignment, has lost wages, has been removed from his college courses and self-help groups, and has lost good time credits. The chrono is not supported by any evidence and is inconsistent with Plaintiff's above average performance at work and in his college courses. This chrono was used to justify scheduling a non-regularly scheduled classification committee hearing. The fact that this chrono was later removed from Plaintiff's c-file demonstrates that it was part of an "underground" effort to effect an involuntary transfer to another prison. Because the chrono is no longer valid,

---

[2] Prison records indicate that between February 8, 2018, and the date this complaint was filed, Plaintiff only filed two complaints that were exhausted (i.e., appealed to the third and final level): Grievance No. SQ-18-00591 and Grievance No. SOL-19-01941. Dkt. No. 33-6 at 1-4 ("Moseley Decl."), ¶ 9; Dkt. No. 33-6 at 6. Grievance No. SOL-19-01941 is not relevant to this action. Grievance No. SOL-19-01941 alleged that Plaintiff was inappropriately found guilty of RVR No. 6581885, dated May 24, 2019, for possession of alcohol. Dkt. No. 33-6 at 40-68.

United States District Court
Northern District of California

1    the transfer based on the chrono should be invalidated.  Dkt. No. 33-5 at 10-13.  Plaintiff requested

2    that prison officials immediately stop any transfer arising from the February 9, 2018 classification

3    committee hearing; that the prison abide by the recommendations from the last valid classification

4    committee hearing, which was on on November 22, 2018; that the prison allow him to continue

5    his current programing and maintain same custody status and designations, and job (Med B

6    Custody with WG/PG A1/A, job PFM.006.001, PIA HFM-GUS); place him back into his college

7    classes and programs; and restore his good time credits for all college and self-help courses that

8    were disrupted and negatively affected by the February 9, 2018 classification committee hearing.

9    Dkt. No. 33-5 at 10-13.

10            On March 21, 2018, Grievance No. SQ-18-00591 was denied at the first level on the

11   grounds that the transfer decision had been reviewed and approved by a CSR.  Dkt. No. 33-5 at

12   15-16.  The first level denial described the issue as follows:

13           All documents of your [grievance] have been reviewed; the CDCR 602 Inmate/Parolee
         [Grievance] form dated February 21, 2018.  You alleged that a UCC was conducted with
14       your presence and a transfer recommendation was recommended based upon you being
         identified as an inmate that was disruptive to San Quentin State Prison non-designated
15       programming facility.  Specifically, you were noted as being in a position of
         authority/influence in the population to give orders for inmates to be assaulted and
16       battered.  A review of your Electronic Record Management System (ERMS) produced an
         informational 128-B dated November 11, 2011, authored by Correctional Counsel I (CCI),
17       which documents your self-admission of gang activity, and indicated that you are an active
         member of Security Threat Group (STG) Norteno.

18   Dkt. No. 33-5 at 16.  The denial did not address the allegation that Plaintiff was in a position of

19   authority/influence in the population to give orders for inmates to be assaulted and battered.  The

20   denial relied solely on the classification committee action being reviewed and approved by the

21   CSR.  Dkt. No. 33-5 at 16.

22            On April 15, 2018, Plaintiff appealed the first level denial as follows:
         I am very dissatisfied with response – the specific issue expressed in my 602 was not at all
23       addressed.  San Quentin "falsified" a document against myself (and a whole segment of
         inmate population) in order to unjustly remove me from program opportunities at San
24       Quentin, then took steps to "destroy evidence" by removing said document from files . . .
         and I further request that San Quentin, classification committee members and CSR rep's
25       all be investigated for collusion in this illegal activity. (Penal Code 134 & 135).

26   Dkt. No. 33-6 at 11.  When interviewed in conjunction with this appeal, Plaintiff told the

27   interviewer: "I feel like my transfer with the other inmates was a result of collusion by committee

28   members and the CSR.  I have can't (sic) prove it but based on the result of my transfer.  I only

8

asked to be transferred to Solano (SOL) because there's a college program there."  Dkt. No. 33-6 at 16.

On July 3, 2018, Grievance No. SQ-18-00591 was denied at the second level on the grounds that there was no evidence of wrongdoing by the committee or the independent auditor (the CSR):

> A review of your SOMS file revealed your attendance within the Unit Classification Committee (UCC) on February 9, 2018.  Committee elects to refer you to the Classification Services Representative (CSR) for a non-adverse transfer to SOL-II based on departmental Programming Needs.  Committee cited you as a disruption to the non-designated Programming Facility (PF).  Specifically, you are in a position of authority and influence over other inmates to assault PF inmates.  During Pre-committee interview, you stated you want to go to DVI due to family needs.  You also requested to be transfer (sic) to SOL due to college program.  The reviewer notes no due process violation and effective communication was establish prior to and during committee.  The reviewer did not find evidence of wrong doing (sic) by committee.  Your case was audit (sic) by an independent CSR on February 16, 2018.

Dkt. No. 33-5 at 9.

On August 17, 2018, Plaintiff appealed the second level decision as follows:

> I am still very dissatisfied (see Section D. of first level response).  Plus, on interview of 7.5.18 I actually said that 1. 3 months before committee action of 2.9.18 – I had already been to committee on 11.29.17, all my case factors had been reviewed and I was determined authorized to continue program at San Quentin H-Unit (Dorm Housing) per Captain Arnold work override and was placed back in job assignment . . . the only thing that changed since then was the application of the illegitamite (sic) 128B chronu by Lt. D. Dorsey dt. (sic) 2.8.18 that was fabricated specifically to use as the basis for an injust involuntary transfer recommendation to CSR. [] Then, on same day that CSR approved the endorsement (2.14.18), "someone" removed Lt. D. Dorsey's 128B chrono from all c-file records. [] To this day this chrono is not in my Cfile yet I was transferred "per" said chrono – to be transferred by these type circumstances would take deliberate and coordinated collusion by CCII, Lt., Cpt., A.W., Warden, CSR representatives and more – to transfer me without just cause.

Dkt. No. 33-6 at 12-13 (emphasis in original).

On November 19, 2018, Grievance No. SQ-18-00591 was denied at the third and final level and made the following findings:

> The Third Level of Review Examiner finds the SLR adequately addressed the appellant's issues on appeal.  The documentation and arguments are credible and demonstrate that the appellant has not supported his allegations with sufficient facts or evidence to counter the institution staffs (sic) decision.  The appellant did not provide any new or additional information justifying a change to the SLR's finding.  The Examiner noted the attached UCC chrono dated February 9, 2019.  The chrono clearly reveals that due to SQ programming and mission changes, the appellant was being transferred as he met the criteria.  The appellant was advised of the October 27, 2017, memorandum titled "Conversion of San Quentin State Prison Facility B, H Unit, Dorm 1 from Level II, General Population Beds to Level II Non-Designated Enhanced Outpatient Beds" and the Memorandum dated December 12, 2017 titled "Programming Implementation, San

Quentin State Prison."  The appellant retained his Work Group / Privilege Group status and he was endorsed for a non-adverse transfer.  On March 31, 2018, the appellant was transferred to SOL III where he is currently housed.

Dkt. No. 33-6 at 8-9.

## II.    Operative Complaint

The second amended complaint makes the following relevant allegations.

In implementing the conversion to NDPFs, SQSP prison officials, including Defendants, conspired to transfer out of SQSP Hispanic GP inmates who had any type of STG association, in violation of Plaintiff's rights under the Equal Protection Clause.  As part of this conspiracy, defendant Dorsey authored a false chrono and defendant Boerum relied on this chrono in recommending that Plaintiff be transferred away from SQSP *See generally* Dkt. No. 21.

The second amended complaint makes the following specific allegations.

On February 8, 2018, defendant Dorsey authored a chrono falsely accusing Plaintiff of being in a position of authority to order assaults on other inmates and a disruption to the SQSP population.  Dkt. No. 21 at 6-7.

On February 9, 2018, a classification committee, chaired by defendant Boerum, reviewed Plaintiff's placement.  Despite being informed by Plaintiff that the February 8, 2018 chrono was false, defendant Boerum relied on this chrono in deciding to transfer Plaintiff out of SQSP and away from the job, college classes, and programming that Plaintiff had secured, as well as the related ability to earn good time credits.  Dkt. No. 21 at 7-9, 16-17.

On February 14, 2018, when Plaintiff asked his correctional counselor Sibley for a copy of the chrono, he was told that the chrono was no longer in the system.  When Plaintiff asked who removed the chrono, Sibley said that the system did not record who removed the chrono, but that only someone above the rank of correctional counselor could remove it.  When Plaintiff asked Sibley if he had ever seen a chrono applied to a person a day before committee and then removed from the file once the transfer was endorsed by the CSR, Sibley responded, "No, that is highly unusual, but you can appeal it."  Dkt. No. 21 at 9.

On February 18, 2018, Plaintiff spoke with correctional officer Martin and requested a classification committee review.  Officer Martin responded, "I see what you are saying but I am

10

not going to sugarcoat this. You are Hispanic and from Northern California right. Well it has been decided to get every G.P. Hispanic with STG connection of any type out of here even if he is paisa. The warden has signed off on N.D.P.F. and so in your case it doesn't matter what you have going, you are going to be fast tracked out of here." Plaintiff questioned the legality of such action, and Officer Martin responded, "It does not matter, we will have all of you out of here as soon as we can, no 602 appeal is going to change anything. You can expect a vague B.S. response and denial, plus guess what, at the highest level of appeal review it will be seen by the director of CDCR in Sacramento, and from here to there, everyone is already aware and on board with this so it doesn't matter what you say on any appeal." Dkt. No. 21 at 10-11.

The second amended complaint requested the following relief: a permanent injunction removing the February 8, 2018 chrono from Plaintiff's records; that the creation of NDPFs be discontinued; that CCC Facility B and a commensurate number of fire camps, as well as Level 1 and Level 2 facilities, be reverted back to their previous GP housing status; that Plaintiff be restored to the status and case factors he had on November 22, 2017, along with an override to remain at CSP-Solano Level 3, A Facility, WG/PG A1A place in job, preliminary score of 40, and expungement of all disciplinary violations after November 22, 2017; that Plaintiff be awarded the good-time credits he would have been awarded for completing college classes if he had remained enrolled since November 22, 2017, minus the credits he was able to earn at CSP-Solano; that Plaintiff be awarded the milestone completion credit he would have incurred from PIA-HFM training test; that Plaintiff be paid backpay for the PIA-HFM full time workhours that he would have earned since November 22, 2017; that Plaintiff's case factors be updated to reflect the changes from made from November 22, 2017 to present; and that Plaintiff be recommended for recall and resentence pursuant to Cal. Penal Code § 1170(d)(1). The second amended complaint also sought general and punitive damages. Dkt. No. 21 at 24-25.

## DISCUSSION

Defendants argue that they are entitled to summary judgment for two reasons. First, Defendants argue that Plaintiff did not exhaust his administrative remedies because Grievance No. SQ-18-00591 did not contain sufficient facts to alert prison officials to Plaintiff's equal protection

11

1    and conspiracy claims.  Second, Defendants argue that Plaintiff's equal protection claim fails on

2    the merits because the evidence shows that neither the February 8, 2018 chrono nor the transfer

3    were motivated by Plaintiff's race or by his membership in a protected class.  Third, Defendants

4    argue that Plaintiff's conspiracy claim fails on the merits because Plaintiff has failed to show the

5    existence of a meeting of the minds or that a constitutional violation occurred.  In the alternative,

6    Defendants argue that they are entitled to qualified immunity.  Fourth, Defendants argue that

7    Plaintiff's request for injunctive relief is moot; and that the punitive damages request fails as a

8    matter of law because Plaintiff has failed to demonstrate either evil motive or intent or reckless

9    and callous indifference to federally protected rights.

10   **I.      Summary Judgment Standard**

11          Summary judgment is proper where the pleadings, discovery and affidavits show that there

12   is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

13   law." *See* Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.

14   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is

15   genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving

16   party.  *See id.*

17          A court shall grant summary judgment "against a party who fails to make a showing

18   sufficient to establish the existence of an element essential to that party's case, and on which that

19   party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an

20   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

21   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The moving party bears the initial

22   burden of identifying those portions of the record that demonstrate the absence of a genuine issue

23   of material fact.  *Id.* at 323.  The burden then shifts to the nonmoving party to "go beyond the

24   pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and

25   admissions on file, 'designate 'specific facts showing that there is a genuine issue for trial.'" *See*

26   *id.* at 324 (citing Fed. R. Civ. P. 56(e)).

27          For purposes of summary judgment, the court must view the evidence in the light most

28   favorable to the non-moving party, drawing all justifiable inferences in that party's favor.  *AXIS*

United States District Court
Northern District of California

1   *Reinsurance Co. v. Northrop Grumman Corp.*, 975 F.3d 840, 844 (9th Cir. 2020).  If, as to any

2   given material fact, evidence produced by the moving party conflicts with evidence produced by

3   the nonmoving party, the Court must assume the truth of the evidence set forth by the nonmoving

4   party with respect to that material fact.  *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).

5   However, facts must be viewed in the light most favorable to the nonmoving party only if there is

6   a "genuine" dispute as to those facts.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The court's

7   function on a summary judgment motion is not to make credibility determinations or weigh

8   conflicting evidence.  *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017).

9   **II.     Exhaustion**

10          **A.      PLRA Exhaustion Requirement**

11          The PLRA sets forth the following exhaustion requirement: "No action shall be brought

12   with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner

13   confined in any jail, prison, or other correctional facility until such administrative remedies as are

14   available are exhausted."  42 U.S.C. § 1997e(a).  The PLRA's exhaustion requirement is

15   mandatory, *Jones v. Bock*, 549 U.S. 199, 211 (2007), and requires "proper exhaustion" of

16   available administrative remedies, *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  Proper exhaustion

17   requires using all steps of an administrative process and "demands compliance with an agency's

18   deadlines and other critical procedural rules because no adjudicative system can function

19   effectively without imposing some orderly structure on the course of its proceedings."  *Woodford*,

20   548 at 90–91.  Compliance with prison grievance procedures is all that is required by the PLRA to

21   "properly exhaust."  *Jones*, 549 U.S. at 217–18.

22          Where a prison's grievance procedures do not specify the requisite level of factual

23   specificity required in the grievance, "'a grievance suffices if it alerts the prison to the nature of

24   the wrong for which redress is sought.'"  *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009)

25   (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)).  The grievance need not include

26   legal terminology or legal theories unless they are needed to provide notice of the harm being

27   grieved.  *Id.*  Nor must a grievance include every fact necessary to prove each element of an

28   eventual legal claim.  *Id.*  The purpose of a grievance is to alert the prison to a problem and

United States District Court
Northern District of California

facilitate its resolution, not to lay groundwork for litigation. *Id.* The grievance should include sufficient information "to allow prison officials to take appropriate responsive measures." *Id.* (citation and internal quotation omitted). *Compare id.* (no exhaustion where grievance complaining of upper bunk assignment failed to allege, as complaint had, that nurse had ordered lower bunk but officials disregarded that order) *with Reyes v. Smith*, 810 F.3d 654, 658-59 (9th Cir. 2016) (plaintiff's claim exhausted as to prison doctors named in federal action where grievance plainly put prison officials on notice of nature of wrong alleged in federal action – denial of pain medication by defendant doctors – and prison officials easily identified named prison doctors' involvement in the issue) *and Wilkerson v. Wheeler*, 772 F.3d 834, 840 (9th Cir. 2014) (claim properly exhausted where inmate described nature of wrong and identified defendant as a responding officer who deliberately applied pressure to inmate's ankle to inflict pain). Administrative remedies may not be exhausted where the grievance, liberally construed, does not have the same subject and same request for relief. *See, e.g., Morton v. Hall*, 599 F.3d 942, 946 (9th Cir. 2010) (grievance that complained of visitation restrictions, and did not mention assault or theorize that visitation restriction imposed was related to assault, was insufficient to put prison officials on notice that staff misconduct contributed to assault); *O'Guinn v. Lovelock Correctional Center*, 502 F.3d 1056, 1062, 1063 (9th Cir. 2007) (even with liberal construction, grievance requesting lower bunk due to poor balance resulting from previous brain injury was not equivalent to, and therefore did not exhaust administrative remedies for, claims of denial of mental health treatment in violation of ADA).

Failure to exhaust under the PLRA is an affirmative defense that the defendant must plead and prove. *Jones*, 549 U.S. at 204, 216. The defendant's burden is to prove that there was an available administrative remedy and that the prisoner did not exhaust that available administrative remedy. *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014). The ultimate burden of proof remains with the defendant. *Id.* at 1172. If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. *Id.* at 1166. But if material facts are disputed, summary judgment should be denied and the district judge rather than a jury should determine the facts in a preliminary

14

1    proceeding.  *Id.*

2        **B.    Analysis**

3        Defendants argue that Grievance No. SQ-18-00591 failed to serve the primary purpose of

4    the administrative remedy process because it did not alert prison officials to Plaintiff's equal

5    protection and conspiracy claims against Defendants.  Defendants argue that Grievance No. SQ-

6    18-00591 "focuses solely on an allegedly 'illegitimate' committee action, the existence and

7    subsequent removal of the February 8, 2018 chrono, and the transfer's effect on Plaintiff's work

8    and education assignment," but fails to adequately describe, or even reference, any discriminatory

9    motive by Plaintiff and does not mention Plaintiff's race or protected class.  Defendants argue that

10   Grievance No. SQ-18-00591 therefore failed to provide Defendants with notice, and the

11   opportunity to address, any discriminatory action.  In addition, Defendants argue that the

12   conspiracy claim was not raised in the initial grievance but raised "improperly" for the first time at

13   the third level of review, and that raising an issue at later levels of review does not suffice to

14   exhaust administrative remedies for a claim.  Dkt. No. 33 at 18-19.

15       The Court finds that Grievance No. SQ-18-00591 satisfied the PLRA's exhaustion

16   requirement with respect to the equal protection and conspiracy claims raised in this action.  The

17   Ninth Circuit has held that, because the primary purpose of a grievance is to alert the prison to a

18   problem and facilitate its resolution and not to lay groundwork for litigation, a grievance need not

19   include legal terminology or legal theories unless they are in some way needed to provide notice

20   of the harm being grieved.  *Griffin*, 557 F.3d at 1120.  Grievance No. SQ-18-00591 sufficiently

21   alerted prison officials that the February 8, 2018 chrono and related transfer away from SQSP

22   were problematic, even if Plaintiff could not identify, at that time, why Defendants had generated

23   a false chrono and used it to transfer him away from SQSP.  The grievance sufficiently alerted

24   Defendants that there was an alleged problem with the chrono and transfer because it contended

25   that the chrono was false, that the chrono had been generated solely for the purpose of transferring

26   Plaintiff out of SQSP, and that the following circumstances rendered the chrono and transfer

27   unusual and suspicious: the chrono was not supported by any evidence, the chrono was

28   inconsistent with Plaintiff's work performance and participation in college classes being above

United States District Court
Northern District of California

15

average, the chrono was removed immediately after the committee recommended the transfer, Plaintiff had recently had his usual annual classification committee hearing in November 2017; the February 2018 classification hearing was not a regularly scheduled meeting; and Plaintiff had done nothing between the November 2017 classification committee hearing and February 2018 that justified an adverse transfer.  *See* Dkt. No. 33-6 at 10-12.

Moreover, prison regulations only require that the inmate state "all facts known and available to him[] regarding the issue being appealed *at the time of submitting the [grievance]*." 15 Cal. Code Regs. § 3084.2(a)(4) (emphasis added).  According to the operative complaint, Plaintiff first learned of the discriminatory motive the day that he filed the complaint, when he spoke to Officer Martin.  Making all reasonable inferences in Plaintiff's favor, the Court presumes that Plaintiff did not know that an alleged staff-wide conspiracy to discriminate against Northern California Hispanic inmates with STG connection motivated the transfer until after he filed the grievance.  Plaintiff therefore could not have alleged either discrimination or a conspiracy in the grievance.  Once Plaintiff knew of the alleged discrimination and conspiracy, he informed prison officials by making these allegations in his April 15, 2018 appeal of the first level decision.

Based on the above, the Court finds that, viewing the record in the light most favorable to Plaintiff, Grievance No. SQ-18-00591 exhausted the equal protection and conspiracy claims raised in this action.  The Court therefore DENIES Defendants' motion for summary judgment for failure to exhaust administrative remedies, and turns to the merits of Plaintiff's claims.

### III.    Equal Protection Claim

Defendants argue that Plaintiff cannot establish his equal protection claim against either defendant because the undisputed evidence shows that neither the February 8, 2018 chrono nor the February 9, 2018 transfer decision were based on Plaintiff's race or his membership in a protected class.  Defendants allege that the February 8, 2018 chrono was the result of an investigation aimed at identifying STG-affiliated inmates who were involved in the ongoing attacks on SNY inmates, and that the February 9, 2018 transfer was based on Plaintiff's increase in placement score and departmental programming needs.  Plaintiff has not responded to the summary judgment motion but has made the following relevant allegations in the operative complaint that create a triable

16

issue of fact.  Defendant Boerum stated in the classification committee hearing that a decision had been made above him "to get all of you out of here."  Officer Martin stated that Plaintiff's transfer decision was the result of an unofficial prison-wide decision to transfer out of SQSP every general population Hispanic inmate with an STG connection.  Correctional counselor Sibley said that it was highly unusual for a chrono to be applied to an inmate the day before a classification committee and then removed from the file once the transfer was endorsed by the CSR.  The February 2018 classification committee hearing was not his regular annual classification review, but specifically requested.

In order to present an equal protection claim, a prisoner must allege that his treatment is invidiously dissimilar to the treatment of other inmates.  *More v. Farrier*, 984 F.2d 269, 271-72 (8th Cir. 1993) (absent evidence of invidious discrimination, federal courts should defer to judgment of prison officials).  The first step in determining whether the inmate's equal protection rights were violated is to identify the relevant class of prisoners to which he belongs.  *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013).  "Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citation omitted).  Invidious racial discrimination such as racial segregation, which is unconstitutional outside prisons, also is unconstitutional within prisons.  *See Johnson v. Calif.*, 543 U.S. 499, 505-06 (2005).  A prison classification based on race is immediately suspect and is subject to the same strict scrutiny as a racial classification outside prison.  *See id.* at 508-10.  Prison officials must therefore demonstrate that the race-based policy or action is narrowly tailored to serve a compelling state interest.  *Id.* at 510-11 (remanding case for determination of whether CDC's policy of temporarily segregating inmates by race when they initially arrive in prison system or are transferred to new prison is narrowly tailored to serve compelling state interest).  A claim of racial discrimination under the Equal Protection Clause requires a showing of discriminatory intent.  *Washington v. Davis*, 426 U.S. 229, 239-40 (1976).  In determining whether a discriminatory intent or purpose exists, the court "may consider direct evidence of discrimination, statistical evidence showing a discriminatory impact, or other factors that could reveal a discriminatory purpose, like the historical background of the policy."

1     *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239,1261 (9th Cir. 2016).

2         Viewing the record in the light most favorable to Plaintiff, the Court finds that there is a

3 triable issue of material fact as to whether defendant Dorsey authored the February 8, 2018 chrono

4 and defendant Boerum transferred Plaintiff away from SQSP because Plaintiff is Hispanic.  The

5 following undisputed facts and allegations create a triable issue of fact.  The February 8, 2018

6 chrono provides no specific evidence to support its conclusion that Plaintiff was in a position of

7 authority to give orders for other inmates to be assaulted and Defendants have not provided the

8 Court with any evidence supporting the chrono's conclusion.  Plaintiff's annual classification

9 committee hearing in November 2017, two months prior to the February 8, 2018 chrono, did not

10 note any such concerns, and instead came to the opposite conclusion: that Plaintiff could remain

11 housed at SQSP.  The February 8, 2018 chrono was generated two days after the February 2018

12 classification committee hearing was requested and a day before the committee hearing, and

13 removed five days after the transfer decision was made.  Correctional counselor Sibley stated that

14 it is unusual for a chrono to be generated a day before committee and removed after the committee

15 hearing.  It is unclear why a chrono would be removed from an inmate's central file simply

16 because of a negative impact.  Defendant Boerum informed Plaintiff that a decision had been

17 made "above" defendant Boerum to get "all of you out of here."  Officer Martin informed Plaintiff

18 that a decision had been made to transfer every general population Hispanic inmate from Northern

19 California and with STG connections away from SQSP.  In addition, although Defendants claim

20 that the transfer decision was based on an increase in Plaintiff's classification level, the record

21 does not reflect an increase in classification level between the November 2017 classification

22 committee hearing where the committee found that Plaintiff was appropriately housed at SQSP H-

23 Unit and the February 2018 classification committee hearing.  Also, although Defendants claim

24 that the transfer decision did not rely on the February 8, 2018 chrono, in responding to Grievance

25 No. SQ-18-00591, which challenged the transfer, prison officials referenced the February 8, 2018

26 chrono in both the first and second level denials.  Although neither denial relied on the February 8,

27 2018 chrono in denying the grievance, a jury could reasonably conclude that the references to this

28 chrono indicated that it was at least relevant to the transfer decision.  Viewing the record in the

United States District Court
Northern District of California

1    light most favorable to Plaintiff, there is a triable issue as to whether the February 8, 2018 chrono

2    and February 9, 2018 transfer decision were motivated by Plaintiff's race.

3    **IV.    Conspiracy Claim**

4           Defendants argue that Plaintiff cannot establish his conspiracy claim because he has not

5    introduced any evidence or specifically alleged facts to demonstrate a "meeting of the minds" to

6    support a viable conspiracy claim against Defendants and because he has not demonstrated that

7    Defendants engaged in a constitutional violation.

8           A civil conspiracy is a combination of two or more persons who, by some concerted

9    action, intend to accomplish some unlawful objective for the purpose of harming another which

10   results in damage.  *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999).  To prove a

11   civil conspiracy, the plaintiff must show that the conspiring parties reached a unity of purpose or

12   common design and understanding, or a meeting of the minds in an unlawful agreement.  *Id.*  To

13   be liable, each participant in the conspiracy need not know the exact details of the plan, but each

14   participant must at least share the common objective of the conspiracy.  *Id.*  A defendant's

15   knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and

16   from evidence of the defendant's actions.  *Id.* at 856-57.  *See Park v. Thompson*, 851 F.3d 910 at

17   928-29 (9th Cir. 2017) (finding plaintiff adequately pleaded civil conspiracy where she alleged

18   that police detective colluded with Doe defendants to arrange for filing of criminal charges against

19   defense witness in effort to make the witness unavailable to testify).

20          Viewing the record in the light most favorable to Plaintiff, the Court finds that there is a

21   triable issue of fact as to whether there was a conspiracy among SQSP prison officials, including

22   Defendants, to transfer Hispanic inmates with STG connections away from SQSP.  Defendant

23   Boerum referenced a directive or plan from "above" in responding to Plaintiff's challenge to his

24   transfer, Dkt. No. 21 at 8, and Officer Martin stated that the plan was known from SQSP to "the

25   director of CDCR in Sacramento, Dkt. No. 21 at 10-11 ("everyone is already aware and on board

26   with this so it doesn't matter what you say on any appeal.").  And, as discussed above, there is a

27   triable issue of fact as to whether the chrono and transfer decision violated the Equal Protection

28   Clause.

United States District Court
Northern District of California

19

**V.      Qualified Immunity**

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  The doctrine of qualified immunity attempts to balance two important and sometimes competing interests — "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).  The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "'swiftly and firmly'" in situations where the rules governing their actions are often "'voluminous, ambiguous, and contradictory.'" *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citing *Davis v. Scherer*, 468 U.S. 183, 196 (1984)).

"The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller*, 576 F.3d at 993.  To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232.  Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236.

Defendants argue that they are entitled to qualified immunity because there was no constitutional violation and because, at the time of the alleged misconduct, there was no clearly established constitutional right to incarceration in a particular institution.

As discussed above, there is a triable issue of fact as to whether Defendants conspired to violate Plaintiff's rights under the Equal Protection Clause.  Defendants' qualified immunity arguments rely on the Court accepting their version of the relevant events.  However, at summary judgment, the Court must view the record in the light most favorable to Plaintiff.  In addition, the constitutional right at issue is not the right to be incarcerated in a particular institution, but rather

United States District Court
Northern District of California

the right not to be discriminated against on the basis of race absent a compelling state interest.  At

the time of the alleged violation, it was clearly established that prisons may not discriminate

against inmates on the basis of race, including when making housing decisions, unless the policy

employing race-based classification was narrowly tailored to serve a compelling state interest.

*Johnson*, 543 U.S. at 508–09 (finding that racial classifications, including prison policy of housing

inmates only with inmates of same race, was subject to strict scrutiny and violated Equal

Protection Clause unless prison demonstrated that classification was narrowly tailored to serve

compelling state interest).  Defendants therefore are not entitled to qualified immunity on the

record before the Court.

## VI.      Request for Injunctive Relief and Punitive Damages

Defendants argues that this case must be dismissed because Plaintiff's requests for

injunctive relief are moot.  Dkt. No. 33 at 22.  Specifically, Defendants argue that Plaintiff's

chrono was removed from his c-file in February 2018 and that Defendants do not have ability to

effect the remaining requests: reinstatement of his status and case factors as determined in the

November 2017 classification committee; retention in CSP-Solano; and the good-time credits,

wages, and college credit he would have received had the transfer not occurred.  Dkt. No. 23 at 27.

The Court agrees that Plaintiff's requests for injunctive relief are moot.  Plaintiff has since been

released on parole.  Accordingly, the Court GRANTS Defendants' request to dismiss Plaintiff's

requests for injunctive relief as moot.

However, the dismissal of Plaintiff's requests for injunctive relief does not moot the entire

case, because relief remains available to Plaintiff.  In addition to injunctive relief, Plaintiff also

seeks general and punitive damages.  Dkt. No. 21 at 24-25.  Defendants argue that Plaintiff's

request for punitive damages should be dismissed because Plaintiff cannot show evil motive or

intent or reckless and callous inference to federally protected rights because he has not established

that Defendants engaged in unconstitutional discrimination.  Dkt. No. 33 at 23-24.  This argument

relies on the Court accepting Defendants' version of the relevant events.  Viewing the record in

the light most favorable to Plaintiff, there remains a triable issue as to whether Defendants

exhibited reckless and callous inference to federally protected rights by engaging in

United States District Court
Northern District of California

1    unconstitutional discrimination.  The Court DENIES Defendants' motion to dismiss the request

2    for punitive damages.

3        In addition, Plaintiff may be entitled to nominal damages.  *See Schneider v. County of San*

4    *Diego*, 285 F.3d 784, 794 (9th Cir. 2002) (nominal damages *must* be awarded if plaintiff proves

5    violation of his constitutional rights) (finding that plaintiff was entitled to nominal damages on

6    procedural due process claim, as matter of law, "as a symbolic indication of his constitutional

7    right").  Because potential relief remains available to Plaintiff, the Court declines to dismiss this

8    action as moot.

9                                        **CONCLUSION**

10       For the reasons set forth above, the Court orders as follows.

11       1.       The Court GRANTS IN PART AND DENIES IN PART Defendants' motion for

12   summary judgment.  The Court GRANTS Defendants' motion to dismiss Plaintiff's claims for

13   injunctive relief.  The Court DENIES the remainder of Defendants' motion for summary

14   judgment.

15       2.       Plaintiff has not communicated with the Court since October 10, 2021, and filed no

16   opposition to Defendants' summary judgment motion.  ECF No. 35.  Within twenty-eight days of

17   the date of this order, Plaintiff is ordered to show cause why this action should not be dismissed

18   for failure to prosecute.  In his response, Plaintiff should inform the Court whether he wishes to

19   proceed with this action.  Failure to respond in accordance with this order will result in this action

20   being dismissed for failure to prosecute pursuant to Fed. R. Civ. P. 41(b).

21       This order terminates Dkt. No. 33.

22       **IT IS SO ORDERED.**

23   Dated:  6/22/2022

24

25                                        HAYWOOD S. GILLIAM, JR.
                                          United States District Judge

26

27

28

22